IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

*Alexandria Division*

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>THE RESIDENCE LOCATED AT 9406 LAFAYETTE AVENUE, MANASSAS, VIRGINIA | Case No. 1:26-sw-302 |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Jose J. Oquendo, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of a search warrant for the residence located at 9406 Lafayette Avenue, Manassas, Virginia (the "PREMISES"), as further described below and in Attachment A. I submit that there is probable cause to believe that this location contains evidence, instrumentalities, contraband, and fruits of the crimes of illegal possession of firearms, in violation of 18 U.S.C. § 922(g)(5)(A) (Possession of a Firearm by an Alien), and illegally dealing in firearms, in violation of 18 U.S.C. § 922(a)(1)(A) (Dealing in Firearms Without a License) (the "TARGET OFFENSES"), as further described below and in Attachment B.

2.      I am a Special Agent with ATF and have been so employed since 2014. I am currently assigned to the ATF Washington Field Division, Falls Church II Field Office, an enforcement group responsible for investigating violent crime, gangs, armed drug trafficking, and other firearm related violations. In my capacity as a law enforcement officer, I have investigated individuals for the illegal possession and use of firearms. I have successfully completed numerous training programs hosted or sponsored by ATF, the Federal Law Enforcement Training Center,

1

and other federal law enforcement agencies and organizations. I have received specialized training in the investigation of federal crimes involving firearms and narcotics.

3.    As a Special Agent with ATF, I am authorized, pursuant to 18 U.S.C. § 3051, to enforce any of the criminal, seizure, or forfeiture provisions of the laws of the United States.

4.    I have participated in the investigation of the offenses set forth below. The facts and information contained in this affidavit are based on my personal knowledge and information obtained from other law enforcement officers and witnesses. All observations referenced in this affidavit that were not personally made by me were relayed to me by the person(s) who made such observations or in reports that detailed the events described by that person(s). This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

<u>PROBABLE CAUSE</u>

5.    On or about February 18, 2026, ATF and Homeland Security Investigations ("HSI") investigators received information from a Confidential Source ("CS") regarding MERA-RAMIREZ.[1] The CS stated that MERA-RAMIREZ is an illegal alien from Michoacan, Mexico, who was selling firearms in the Manassas area.

6.    The CS said that MERA-RAMIREZ owed the CS approximately $7,000 and offered to pay the debt by giving the CS four rifles and a shotgun. The CS showed investigators an image that he had received by text message on February 13, 2026, from MERA-RAMIREZ's phone number. That text message included an image (below) of what appears to be four long guns—three rifles and a shotgun.

---

[1] The CS is cooperating with investigators with the hope of receiving an immigration benefit.



7.      According to the CS, MERA-RAMIREZ told the CS that the guns belonged to MERA-RAMIREZ's son. MERA-RAMIREZ's son was arrested by Immigration and Customs Enforcement on December 3, 2025, and is currently detained.

8.      Investigators learned that MERA-RAMIREZ pawned a concrete saw at a pawnshop in Manassas on February 18, 2026. The pawnshop's records reflect that MERA-RAMIREZ provided his phone number, the same one referenced above in paragraph 6, and used his Mexican Consular ID card as identification. MERA-RAMIREZ also provided his address to the pawnshop as 9406 Lafayette Avenue, Manassas, Virginia.

9.      At the direction of investigators, the CS contacted MERA-RAMIREZ on February 19, 2026. Through text messages, the individual, who I believe to be MERA-RAMIREZ, agreed to exchange the firearms for the debt that MERA-RAMIREZ owed to the CS.

3

10.     On February 20, 2026, ATF and HSI special agents conducted a controlled purchase of five firearms[2] from MERA-RAMIREZ through the CS.[3] The operation was audio and video recorded. During the controlled purchase, the CS traveled to MERA-RAMIREZ's residence at 9406 Lafayette Avenue. This location is in Prince William County, Virginia, within the Eastern District of Virginia. There, MERA-RAMIREZ handed the CS a black trash bag that contained firearms. MERA-RAMIREZ also carried out of his house another black trash bag that held firearms and placed it into the trunk of the CS's car. During the transaction, MERA-RAMIREZ told the CS to come back later for more firearms.

11.     Between the two bags were five firearms[4]—four rifles and a shotgun:

- SAVAGE; Model: 10; Caliber: .308; RIFLE; S/N: K646452;

- ANDERSON MANUFACTURING; Model: AM-15; Caliber: MULTI; RIFLE; S/N: 19146164;

- BENELLI, S. PA.; Model: NOVA; Caliber: 12; SHOTGUN; S/N: Z084526;

- KELTEC, CNC INDUSTRIES, INC.; Model: SUB-2000; Caliber: .40; RIFLE; S/N: 19457; and

- RUGER; Model: 10/22; Caliber: .22; RIFLE; S/N: 0003-36569.[5]

---

[2] One of the firearms was not pictured in the image shown above in paragraph 6.

[3] In these controlled purchases, the CS met with law enforcement officers at a staging location. There, the investigators searched the CS for weapons, contraband, and currency, and did not find any. The investigators provided the CS with a recording device and recorded "buy funds." The CS then drove, while under law enforcement surveillance, to MERA-RAMIREZ's home to meet with him. The investigators surveilled the CS's meeting with MERA-RAMIREZ. After the transaction, the law enforcement officers surveilled the CS as he drove from MERA-RAMIREZ's home to the staging location. The investigators took possession of the firearms from the CS at the staging location.

[4] Investigators test-fired the firearms and submitted the test-fired casings to the National Integrated Ballistics Information Network ("NIBIN"). Each of these long guns is a "firearm" as defined in 18 U.S.C. § 921(a)(3).

[5] The seized Anderson Manufacturing, Benelli, Keltec, and Ruger firearms appear to be the same ones pictured in the text message in paragraph 6.

12.     The trash bags also contained a magazine loaded with 14 rounds of .223 caliber ammunition and 11 rounds of .22 caliber ammunition.

13.     After the purchase concluded, the device using MERA-RAMIREZ's phone number sent the CS a picture of additional firearms (below). MERA-RAMIREZ offered to sell the pictured handguns for $1,800.



14.     On March 5, 2026, ATF and HSI special agents conducted a second controlled purchase of four firearms from MERA-RAMIREZ through the CS. The operation was audio and video recorded. During the controlled purchase, the CS traveled to MERA-RAMIREZ's residence at 9406 Lafayette Avenue. MERA-RAMIREZ handed the CS a white plastic bag that contained firearms.

15. There were four handguns in the bag:[6]

- TAURUS; Model: 856; Caliber: .38; REVOLVER; S/N: ABN350353;

- GLOCK; Model: 45; Caliber: 9mm; PISTOL; S/N: BKDY539;

- HS PRODUKT; Model: XDM Elite; Caliber: 9mm; PISTOL; S/N: AT289591;

- FIE; Model: Titan; Caliber: .25; PISTOL; S/N: 104725; and

- RUGER; Model: 10/22; Caliber: .22; RIFLE; S/N: 0003-36569.[7]

16. The Glock pistol was outfitted with a 30-round extended pistol magazine.

17. Investigators have queried law enforcement and immigration databases for records related to MERA-RAMIREZ, the person that MERA-RAMIREZ identified as his son to the CS, and the person who investigators identified as MERA-RAMIREZ's wife. Investigators have also reviewed images of the Mexican Consular ID referenced above in paragraph 8.

18. According to Mexican government documents, a Consular ID is "proof of Mexican nationality and domicile abroad. It is issued by Mexican consulates after a rigorous process to confirm the identity and residence of the bearer." The Consular ID has a series of security features to confirm authenticity. MERA-RAMIREZ's Consular ID appears to be genuine. The United States Embassy in Mexico confirmed the accuracy of this information.

19. Immigration records for the individual who MERA-RAMIREZ identified as his son show that this individual was born in Mexico. That person has no lawful status in the United States

---

[6] Investigators test-fired the pistols and submitted the test fired casings to NIBIN. Each of these handguns is a "firearm" as defined in 18 U.S.C. § 921(a)(3). The revolver was not test-fired, but appears, based on my training and experience, to be a "firearm."

[7] The seized Taurus, Glock, HS Produkt, FIE, and Ruger firearms appear to be the same ones pictured in the text message referenced in paragraph 13. One of the handguns pictured in paragraph 13 was not sold to the CS.

MERA-RAMIREZ does not have a license to deal in firearms.

and currently is in immigration custody for reinstatement of a final order of removal, which was issued by an immigration judge on or about September 30, 2025.

20.    Immigration records for the individual who investigators identified as MERA-RAMIREZ's wife show that she was born in Mexico. She previously entered the United States without inspection and was returned to Mexico voluntarily on December 16, 2006. She has no lawful status in the United States.

21.    There is no record of MERA-RAMIREZ's lawful entry into the United States nor any pending applications for lawful status. This absence of records is consistent with an individual's entry into the United States without inspection, *i.e.* entering into the country other than at a time and place designated by immigration officials, thus evading inspection.[8]

22.    On March 13, 2026, the Honorable William E. Fitzpatrick issued a search warrant for information associated with MERA-RAMIREZ's phone number, (703) 398-5288, referenced above in paragraphs 6, 8, 9, and 13. Subscriber information from AT&T showed the listed address for that phone number as 9406 Lafayette Avenue. Further, location data for the device using that phone number showed that it was located in Manassas.

<u>USE OF THE PREMISES AND CELLULAR DEVICES</u>

23.    Based on my training and experience, I know that individuals involved in trafficking firearms frequently maintain items related to their sales in their residences. This

---

[8] The CS told investigators that the CS observed MERA-RAMIREZ wearing a "Martin and Dad Construction" company t-shirt. A search of Virginia State Corporation records show that "Martin and Dad Construction" was incorporated in June 2015. The president is identified as the individual who investigators believe is MERA-RAMIREZ's wife and the secretary is listed as the person who MERA-RAMIREZ identified to the CS as his son. The business's address is the residence on Lafayette Avenue referenced above in paragraphs 8, 10, 14, and 22.

includes other firearms, ammunition, and magazines being held for sale.[9] Traffickers also frequently maintain order lists of firearms wanted, possessed, and sold; and financial records related to transactions, including evidence of the disposition of firearm trafficking proceeds.

24.    I also know that individuals who illegally possess firearms frequently maintain items related to firearms in their residences. This includes firearms, ammunition, and magazines,[10] and financial records related to firearms.

25.    I also know that individuals involved in trafficking and illegally possessing firearms use cellular devices to further their criminal activities.[11] This activity can involve communications with coconspirators and customers, photographs and videos of firearms, order lists, and financial records.

26.    I submit that there is probable cause to believe that the device that MERA-RAMIREZ used to communicate with the CS will be within the PREMISES at the time of the search, which will be conducted when investigators believe that he is at home, given his use of the device during the investigation, as described above; its location, as provided by AT&T pursuant to the earlier search warrant; and my knowledge that most cell phone users keep their devices with them or in close proximity.

27.    I know from my training and experience, as well as from information found in publicly available materials including those published by cellular phone providers, that some makes and models of cellular phones offer their users the ability to unlock the device via the use

---

[9] As noted above in paragraph 13, after MERA-RAMIREZ sold the first firearms to the CS, he sent a picture of additional firearms that he had for sale. Further, as noted in fn.7, one of the pictures that MERA-RAMIREZ sent to the CS depicted a firearm that he did not sell.

[10] *Id.*

[11] Examples are described above in paragraphs 6 and 9.

of a fingerprint or thumbprint (collectively, "fingerprint") in lieu of a numeric or alphanumeric passcode or password. This feature is called Touch ID.

28.    If a user enables Touch ID on a given cellular phone device, he or she can register fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor. In my training and experience, users of cellular phone devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

29.    In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode or password must be used instead. These circumstances include: (1) when more than 48 hours has passed since the last time the device was unlocked, and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement encounters a locked cellular phone device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if: (1) the device has been turned off or restarted, (2) the device has received a remote lock command, and (3) five unsuccessful attempts to unlock the device via Touch ID are made.

30.    The passcode or password that would unlock the cellular phone is not known to law enforcement. Thus, it will likely be necessary to press the finger(s) of the user(s) of the cellular phone to the device's Touch ID sensor in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. Attempting to unlock the relevant cellular phone

device(s) via Touch ID with the use of the fingerprints of the user(s) is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

31.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device via Touch ID, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any occupant of the PREMISES, to press their finger(s) against the Touch ID sensor of the locked cellular phone device(s) found during the search of the PREMISES in order to attempt to identify the device's user(s) and unlock the device(s) via Touch ID.

32.     Although I do not know which of a given user's 10 fingerprints is capable of unlocking a particular device, based on my training and experience, I know that it is common for a user to unlock a Touch ID-enabled cellular phone device via the fingerprints on thumbs or index fingers. In the event that law enforcement is unable to unlock the cellular phone as described above within the attempts permitted by Touch ID, this will simply result in the device requiring the entry of a password or passcode before it can be unlocked.

33.     Due to the foregoing, I request that the Court authorize law enforcement to press the fingers (including thumbs) of individuals found at the PREMISES to the Touch ID sensor of

10

cellular phones for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by this warrant.

34.    I also know that some cellular devices may be unlocked by scanning an approved-user's face, often called Face ID.

35.    After any cellular phones are seized, law enforcement will attempt to search them. If law enforcement cannot complete the search, then agents will send the phones to a government laboratory or a private company that specializes in data extraction from electronics.

<u>CELLULAR DEVICES, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS</u>

36.    As described above and in Attachment B, this application seeks permission to search for records that might be found in the PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a cellular device's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

37.    *Probable cause.* I submit that if a cellular device is found in the PREMISES, there is probable cause to believe those records will be stored on that cellular device or storage medium, for at least the following reasons:

a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a cellular device, the data contained in

11

the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a cellular device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.    Wholly apart from user-generated files, cellular device storage media—in particular, cellular devices' internal hard drives—contain electronic evidence of how a cellular device has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Device users typically do not erase or delete this evidence because special software is typically required for that task. However, it is technically possible to delete this information.

d.    Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

38.    *Forensic evidence. A*s further described in Attachment B, this application seeks permission to locate not only cellular device files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how cellular devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

12

a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the cellular device was in use. Cellular device file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.    As explained herein, information stored within a cellular device and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a cellular device or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the cellular device or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the cellular device was remotely accessed, thus inculpating or exculpating the

13

cellular device owner. Further, cellular device and storage media activity can indicate how and when the cellular device or storage media was accessed or used. For example, as described herein, cellular devices typically contain information that log: user account session times and durations, cellular device activity associated with user accounts, electronic storage media that connected with the cellular device, and the IP addresses through which the cellular device accessed networks and the internet. Such information allows investigators to understand the chronological context of cellular device or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a cellular device or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a cellular device may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the cellular device user. Last, information stored within a cellular device may provide relevant insight into the cellular device user's state of mind as it relates to the offense under investigation. For example, information within the cellular device may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the cellular device or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.      A person with appropriate familiarity with how a cellular device works can, after examining this forensic evidence in its proper context, draw conclusions about how cellular devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, cellular device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a cellular device is evidence may depend on other information stored on the cellular device and the application of knowledge about how a cellular device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a cellular device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

39.     *Necessity of seizing or copying the entire cellular device or storage media.* In most cases, a thorough search of a premises for information that might be stored on a cellular device or storage media often requires the seizure of the device or physical storage media and later off-site review consistent with the warrant. In lieu of removing the device or storage media from the premises, it is sometimes possible to make an image copy of the device or storage media. Generally speaking, imaging is the taking of a complete electronic picture of the cellular device or storage

15

media's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a cellular device has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Cellular devices can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of cellular device hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. However, taking the device or storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

     c.     Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

40.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying the device or storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

41.    Because people share the PREMISES, it is possible that the PREMISES will contain devices or storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those cellular devices or storage media, the warrant applied for would permit the seizure and review of those items as well.

**CONCLUSION**

42.    Based on the foregoing, I respectfully submit there is probable cause to conclude that from on or about February 13, 2026, through on or about March 13, 2026, in Prince William County, Virginia, within the Eastern District of Virginia, MERA-RAMIREZ illegally possessed firearms, in violation of 18 U.S.C. § 922(g)(5)(A) (Possession of a Firearm by an Alien), and illegally dealt firearms, in violation of 18 U.S.C. § 922(a)(1)(A) (Dealing in Firearms Without a License). Further, I submit that there is probable cause to believe that the property described in Attachment A contains evidence, contraband, fruits, and/or instrumentalities of these criminal activities, as described in Attachment B.

Respectfully submitted,

Jose Oquendo
ATF Special Agent

Subscribed and sworn to by telephone in accordance
with Fed. R. Crim. P. 4.1 on April 16, 2026

Digitally signed by Ivan Davis
Date: 2026.04.17 10:23:56 -04'00'

The Honorable Ivan D. Davis
United States Magistrate Judge

Alexandria, Virginia

18

ATTACHMENT A

*Place to be Searched*

The property to be searched is 9406 Lafayette Avenue, Manassas, Virginia 20109, in the Eastern District of Virginia (the "PREMISES"). The PREMISES is a single-family residence with a black door and a glass storm door. The residence is half brick and half siding. The residence has the numbers listed as 9406 to the left of the doorway. A picture of the PREMISES is below.



19

ATTACHMENT B

*Items to be Seized*

All items constituting evidence and/or instrumentalities of violations of 18 U.S.C. § 922(g)(5)(A) (Possession of a Firearm by an Alien), and 18 U.S.C. § 922(a)(1)(A) (Dealing in Firearms Without a License), including the following:

    a.       Firearms, including firearms parts, accessories, holsters, and ammunition;

    b.       U.S. currency and other illicit gains from the distribution of firearms;

    c.       Books, records, receipts, notes, ledgers, and other papers including any computerized or electronic records including cellular telephones, relating to the ordering, purchase, or possession of firearms;

    d.       Address and/or telephone books and papers, including computerized or electronic address and/or telephone records reflecting names, addresses, and/or telephone numbers;

    e.       Books, records, receipts, bank statements, and records, money drafts, letters of credit, money order and cashier's checks, receipts, pass books, bank checks, safety deposit box keys and any other items evidencing the obtaining, secreting, transfer, concealment, storage and/or expenditure of money or other assets including, but not limited to, firearms and/or firearm parts;

    f.       Documents and papers evidencing ownership of firearms, possession of firearms, storage and location of such assets and facilities to safely store and secure such items, such as safes, to include lock boxes, gun safes, and strong boxes;

    g.       Photographs and videos, in particular, photographs and videos of firearms and/or firearm parts and photographs of individuals possessing firearms and/or controlled substances and photographs showing the association of individuals; and

    h.       Indicia of occupancy, residence, and/or ownership of the premises described herein, including, but not limited to, utility and telephone bills, cancelled envelopes, and keys.

For any cellular device or storage medium whose seizure is otherwise authorized by this warrant, and any cellular device or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "CELLULAR DEVICE"):

    a.       Evidence described above in paragraphs c. through h.;

20

b.      Evidence of who used, owned, or controlled the CELLULAR DEVICE at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

c.      Evidence of software that would allow others to control the CELLULAR DEVICE, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

d.      Evidence of the lack of such malicious software;

e.      Evidence indicating how and when the CELLULAR DEVICE was accessed or used to determine the chronological context of access, use, and events relating to crime under investigation and to the user;

f.      Evidence indicating the CELLULAR DEVICE user's state of mind as it relates to the crime under investigation;

g.      Evidence of the attachment to the CELLULAR DEVICE of other storage devices or similar containers for electronic evidence;

h.      Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the CELLULAR DEVICE;

i.      Evidence of the times the CELLULAR DEVICE was used;

j.      Passwords, encryption keys, and other access devices that may be necessary to access the CELLULAR DEVICE;

k.      Documentation and manuals that may be necessary to access the CELLULAR DEVICE or to conduct a forensic examination of the CELLULAR DEVICE;

l.      Records of or information about Internet Protocol addresses used by the CELLULAR DEVICE;

m.      Records of or information about the CELLULAR DEVICE Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

n.      Contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or

storage, including any form of cellular device or electronic storage (such as hard disks or other

media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "storage medium" includes any physical object upon which cellular device data can be recorded.

During the execution of the search of the PREMISES described in Attachment A, law enforcement personnel are authorized to press the fingers (including thumbs) and faces of individuals found in the PREMISES to the Touch ID or Face ID sensor of cellular phones found at the PREMISES for the purpose of attempting to unlock the device via Touch ID or Face ID in order to search the contents as authorized by this warrant.